**SECURITIES and EXCHANGE COMMISSION, Plaintiff,**

v.

**John Michael KELLY, Steven E. Rindner, Jopseph A. Ripp, and Mark Wovsaniker, Defendants.**

**No. 08 Civ. 4612(CM).**

United States District Court, S.D. New York.

Sept. 30, 2009.

David Frohlich, Jeffrey Brian Finnell, John J. Bowers, Melissa A. Robertson, Richard S. Hong, Richard Edward Simpson, Scott Friestad, Thomas D. Manganello, John David Worland, Jr., Securities and Exchange Commission, Washington, DC, for Plaintiff.

Andrew J. Ceresney, Bruce E. Yannett, Erik Bierbauer, Debevoise & Plimpton, LLP, New York, NY, Emily S. Pierce, Timothy Patrick Peterson, Ada Fernandez Johnson, John V. Ponyiscanyi, Jonathan Rosser Tuttle, Debevoise & Plimpton, LLP, Washington, DC, for Defendant John Michael Kelly.

Anthony Rapa, Erin S. Vagley, Jennie Kneedler, Jeremy D. Engle, Patrick F. Linehan, Jonathan Drimmer, Mark J. Hulkower, Steptoe & Johnson, LLP, Washington, DC, for Defendant Steven Rindner.

Gregory Gene Little, Scott Edward Hershman, White & Case LLP, New York, NY, Stephen Roy Blacklocks, Hunton & Williams, LLP, New York, NY, Bonnie K. Arthur, Hunton & Williams LLP, Washington, DC, for Defendant Joseph A. Ripp.

Glenn R. Reichardt, Bethany M. Nikfar, Erin Ardale Koeppel, Stephen Gregory Topetzes, K&L Gates LLP, Washington, DC, Andrew Lee Morrison, K&L Gates LLP, New York, NY, for Defendant Mark Wovsaniker.

## DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

McMAHON, District Judge:

### *INTRODUCTION*

John Michael Kelly, Steven E. Rindner, Joseph A. Ripp and Mark Wovsaniker were senior managers of America Online, Inc. ("AOL") and its successor corporation, AOL Time Warner Inc. ("AOL Time War-

ner"). (Compl. ¶ 1.) According to the Securities and Exchange Commission ("SEC"), between 2000 and 2003, these executives engineered a series of so-called "round-trip transactions" with more than a half-dozen companies, enabling AOL to improperly recognize roughly one billion dollars in online advertising revenue in violation of the securities laws. (*Id.* ¶¶ 6, 7, 25, 53.)

## FACTS

### I. The Round–Trip Transactions

The SEC alleges that it first became aware of AOL's fraud on July 18 and 19, 2002, through a series of investigative articles in the *Washington Post.* (SEC Mem. in Supp. of Mot. to Dismiss (hereinafter "SEC Mem.") at 91.) The SEC's complaint explains that the fraud was comprised of a series of "round-trip transactions," which are gross-ups of counterparty transactions wherein advertising revenues are exchanged for the value of the gross-up, allowing AOL to fraudulently recognize its own money as revenue (*Id.* ¶¶ 25, 34.) According to the SEC, AOL's round-trips fell into one of three categories:

(1) *Vendor transactions,* in which AOL agreed to pay inflated prices for, or forgo discounts on, goods and services it purchased in exchange for the vendors' purchases of online advertising in the amount of the markup or forgone discount;

(2) *Business acquisitions,* in which AOL increased the price it paid to purchase businesses in exchange for the sellers' purchase of online advertising in the amount of the increase in the purchase price; or

(3) *Settlements of business disputes,* in which AOL converted the settlements of business disputes and legal claims into online advertising revenue.

(*Id.* ¶ 37.)

Each of the four defendants in this case was involved to varying degrees in the different types of transactions. (*Id.*)

Specifically, Kelly and Wovsaniker are credited as the architects behind the round-trips, alleged to have designed them in June 2000 in response to a "growing crisis" facing the online advertising industry. (*Id.* ¶¶ 22–23, 55.) Among their first transgressions was a $250 million deal with network equipment vendor Sun Microsystems, Inc. ("Sun"). (*Id.* ¶ 60.) Pursuant to the terms of a June 2000 agreement, Sun "would agree to 'buy' $37.5 million of advertising from AOL" in exchange for AOL's commitment to purchase $250 million in equipment. (*Id.*) The SEC alleges that Sun paid for the online advertising by gifting certain equipment to AOL, though none of the contracts memorializing their agreement ever reflected AOL's conversion of the value of the equipment into an advertising purchase. (*Id.* ¶¶ 60–61.)

The SEC maintains that, throughout the fourth quarter of 2000, AOL structured similar deals with several other vendors, including:

- Veritas Software Corporation ("Veritas"), which created and licensed data storage software (*id.* ¶¶ 68–76);

- Hewlett–Packard Co. ("HP"), which manufactured and supplied servers that supported AOL's "core computing functions" (*id.* ¶¶ 87–95); and

- Telefonica Data Corp., S.A. ("Telefonica"), which provided network services to AOL's international affiliates (*id.* ¶¶ 98–109).

Wovsaniker is purported to have advised AOL's Business Affairs group in September 2000 on how to obfuscate the Veritas and HP deals. (*Id.* ¶¶ 73–76, 90.) AOL

executive Rindner is alleged to have engineered in November 2000 and subsequently covered up the Telefonica gross-ups, which included the creation of sham ads linked to a dummy website. (*Id.* ¶¶ 102–06.) Specifically, the SEC alleges that AOL created its own ads for Telefonica, linking a misspelled company name ("Telephonica") to a web page that included no content other than the text "Telephonica" in the middle of the page. (*Id.* ¶¶ 106–07.) In an instant message exchange after the site went up, one AOL employee quipped, "I'm doing a little revenue dance at my desk now." (*Id.* ¶ 107.) Rindner responded that the staffer responsible for creating the ad "deserves an award for this one. I'm not kidding." (*Id.*)

## II. Complaints from Auditors

The SEC alleges that senior executives inside AOL "repeatedly complained to Wovsaniker, Ripp and Kelly" about the negative impact of the round-trips on the budgets of AOL subdivisions. (*Id.* ¶¶ 112–17.) Additionally, AOL's external auditor, Ernst & Young LLP ("Ernst & Young"), voiced concerns to Wovsaniker in November 2000 regarding the legitimacy of these transactions. (*Id.* ¶ 64.) In response, Wovsaniker is alleged to have misrepresented the propriety of the Sun transaction. (*Id.* ¶ 80.) AOL executives Kelly and Ripp are alleged to have later misled auditors about the similarly contingent deals with Veritas, HP and Telefonica by providing Ernst & Young with "false and misleading representation letters." (*Id.* ¶¶ 80, 118, 185.)

## III. Continued Violations and Concealment

Ernst & Young's initial inquiries did not deter the AOL executives. Between 2001 and the end of 2003, Kelly, Ripp and Wovsaniker approved certain amendments to a multi-billion dollar agreement governing AOL's buyout of Bertelsmann, A.G.'s interest in AOL Europe, and in exchange received $400 million in online advertising contracts. (*Id.* ¶¶ 119–20, 135, 144.) Although Bertelsmann recognized "the entire $400 million as a reduction in the price of AOL Europe rather than as an advertising expense," AOL accounted for the income as advertising revenue. According to an email Ripp sent to Kelly, Ripp initially had concerns about "booking" the revenue, but the Bertelsmann contracts were nonetheless recorded in such a way as to close the gaps in "commerce and visa revenue" at AOL. (*Id.* ¶ 144.) Throughout 2001 and 2002, AOL filed public disclosures with the SEC improperly recognizing these revenues. (*Id.* ¶¶ 137, 139, 144.) These disclosures included Forms 10–Q filed by AOL on May 6, 2002, August 14, 2002, and November 14, 2002. (*Id.* ¶ 144.)

In addition to the transactions detailed above, in August and September of 2000, Wovsaniker is alleged to have helped convert settlements of business disputes with Ticketmaster Corporation and Wembley, PLC into advertising revenue, and Ripp, Rindner and Wovsaniker are alleged to have done the same with respect to WorldCom, Inc. in June and November of 2001. (*Id.* ¶ 145.)

The SEC argues that the totality of these round-trip transactions made it possible for AOL to "inflate and distort the Company's reported financial results" from September 30, 2000, through the end of 2003, by making it "appear as if AOL had legitimately made or exceeded its revenue targets, and later, to minimize any quarterly revenue shortfall." (*Id.* ¶¶ 25, 37, 39, 42.) The SEC further alleges that Wovsaniker and Rindner, specifically, engaged in a cover-up to conceal the fraudulent nature of the transactions by instructing Business Affairs employees to "delete or omit any cross-references to the trans-

actions in the contracts and transactions summaries." (*Id.* ¶ 184.)

## IV. The Tolling Agreements

In the course of investigating the round-trip transactions, the SEC entered into a series of tolling agreements with the defendants between December 2005 and March 2006. (*Id.* ¶¶ 187–90.) Two of the agreements, those between the SEC and defendants Rindner and Wovsaniker, provide in relevant part:

(1) Any statute of limitations applicable to the filing of a civil action ("the proceeding") against [defendant] or any other action or proceeding brought by or on behalf of the Commission or to which the Commission is a party arising out of the investigation ("any related proceedings"), including any sanctions or relief that may be imposed therein, is tolled for the period beginning on [date beginning] and ending at midnight on [date ending] (the "tolling period");

(2) [Defendant] and any of his agents or attorneys will not assert that the Commission's failure to commence the proceeding or any related proceedings during the tolling period gives him any grounds for (a) asserting any statute of limitations as a defence to the proceeding or any related proceedings, or any sanctions or relief to be asserted therein, or (b) raising in any way any statute of limitations or any failure to commence the proceeding or any related proceedings during the tolling period as a defence to the proceeding or any relating proceedings or to avoid or reduce any sanctions or relief to be imposed therein. . . .

(Drimmer Decl., Sept. 5, 2008, at Ex. 1; Topetzes Deck, Nov. 6, 2008, at Ex. 9.) The tolling agreements the SEC signed with defendants Kelly and Ripp are identical to the above in all material respects, though both shorten a portion of the language in Paragraph (1)—"the filing of a civil action ('the proceeding') against [defendant]"—to simply "the proceeding." (*See* Johnson Deck, Sept. 5, 2008, at Ex. 3.; Little Deck, Sept. 5, 2008, at Ex. I.)

The agreements were in effect for each of the defendants for the following time periods:

- *Kelly:* March 23, 2006, through March 31, 2007;
- *Rindner:* December 20, 2005, through July 31, 2007;
- *Ripp:* March 22, 2006, through March 31, 2007;
- *Wovsaniker:* January 12, 2006, through January 31, 2007.

(*Id.* ¶¶ 187–90.)

Importantly, none of the defendants disputes that the agreements were signed and in effect for the above dates. (Kelly Mem. in Supp. of Mot. to Dismiss (hereinafter "Kelly Mem,") at 4; Rindner Mem. in Supp. of Mot. to Dismiss (hereinafter "Rindner Mem.") at 25 & n. 16; Ripp Mem. in Supp. of Mot. to Dismiss (hereinafter "Ripp Mem.") at 2; Wovsaniker Mem. in Supp. of Mot. to Dismiss (hereinafter "Wovsaniker Mem.") at 6.) Rather, they dispute only the extent to which these agreements can be interpreted as having suspended any statute of limitations applicable to the SEC's claims. (*See* Kelly Mem. at 10; Rindner Mem. at 25 n. 16; Ripp Mem. at 29; Wovsaniker Mem. at 35.) That is, the defendants argue collectively that because the tolling agreements expired months before the SEC filed its complaint, the period during which the statute was tolled ceased to be relevant to an analysis of whether the SEC's claims were time-barred. (*Id.*) Additionally, Mr. Wovsaniker, who does not dispute the va-

lidity of the tolling agreements, argues that the tolling agreements never actually suspended the statute of limitations at all, because "nothing in the agreement discusses an extension of the time to file suit or refers to the suspension of the limitations period." (Wovsaniker Mem. at 36.)

## V. The SEC's Complaint

When the SEC finally filed its complaint on May 19, 2008, it alleges the following seven claims:

*Claim 1:* Section 17(a) of the Securities Act of 1933 by all defendants (Compl. ¶¶ 195–97);

*Claim 2:* Section 10(b) of the Securities Exchange Act of 1934 and accompanying Rule 10b–5 by all defendants (*id.* ¶¶ 198–200);

*Claim 3:* Aiding and abetting violations of Section 10(b) of the Securities Exchange Act of 1934, and accompanying Rule 10b–5, by all defendants (*id.* ¶¶ 201–02);

*Claim 4:* Securities Exchange Act of 1934, Rule 13b2–1 by all defendants (*id.* ¶¶ 203–04);

*Claim 5:* Section 13(b)(5) of the Securities Exchange Act of 1934 by Kelly and Wovsaniker (*id.* ¶¶ 205–07);

*Claim 6:* Securities Exchange Act of 1934, Rule 13b2–2 by Kelly and Wovsaniker (*id.* ¶¶ 208–10); and

*Claim 7:* Aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Securities Exchange Act of 1934, and accompanying Rules 12b–20, 13a–1, 13a–11, 13a–13, and 13b2–1, by all defendants (*id.* ¶¶ 211–14).

Through the above infractions, the SEC argues that AOL misled the investing public, which received incomplete and inaccurate information in the form of misstated advertising and commerce revenue, net and operating income, and reported EBIT-DA (earnings before interest, tax, depreciation and amortization). (*Id.* ¶ 43.) The SEC acknowledges that AOL ultimately recognized its accounting errors and issued a series of restatements between January 28, 2003, and August 17, 2006, reversing its revenue recognition principally in online advertising. (*Id.* ¶¶ 7, 67, 86, 97, 122, 186.) However, the SEC alleges that before AOL corrected its books, the AOL executives involved in crafting the round-trip transactions profited from their fraud by "selling AOL stock at prices inflated by the fraud and by receiving bonuses from AOL based on AOL's artificially inflated financial results." (*Id.* ¶¶ 191–94.) Accordingly, the SEC seeks restitution, civil penalties, an officer and director bar, and permanent injunctive relief to restrain future violations of the securities laws. (*Id.* ¶ Request for Relief.)

## VI. Defendants' Motions to Dismiss

Defendants moved to dismiss the SEC's complaint pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6) on September 5, 2008. Although they each filed separate briefs, their arguments are substantially the same. They argue that the SEC's claims are time-barred under 28 U.S.C. § 2462, which imposes a five-year statute of limitations on the SEC's action. (*See* Kelly Mem. at 8–19; Rindner Mem. at 25–33; Ripp Mem. at 21–23, 26–27, 29; Wovsaniker Mem. at 26–37.) Even if the statute of limitations were not a bar, the defendants argue, the SEC has failed both to meet the heightened pleading requirements of FRCP 9(b) and to adequately plead the elements for each of its claims. (*See* Kelly Mem. at 21–39; Rindner Mem. at 10–24; Ripp Mem. at 12–32; Wovsaniker Mem. at 11–25.)

For the reasons set forth below, the defendants' motions to dismiss are denied.

## DISCUSSION

### I. Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir.2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir.2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* — U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (*citing Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 545, 127 S.Ct. 1955 (internal quotation marks, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570, 127 S.Ct. 1955; *Iqbal,* 129 S.Ct. at 1950–51.

 Additionally, claims sounding in fraud must meet Rule 9(b)'s heightened pleading standard. *See* Fed.R.Civ.P. 9(b). To comply with Rule 9(b), a complainant "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir.2006) (*quoting Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993))(internal quotation marks omitted). Although Rule 9(b) provides that "intent, knowledge, and other conditions of mind may be averred generally," a plaintiff must allege sufficient facts to create a "strong inference" of scienter. *Kalnit v. Eichler,* 264 F.3d 131, 137–38 (2d Cir.2001). A "strong inference" of scienter can be established through factual allegations showing "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,* 381 F.Supp.2d 192, 206 (S.D.N.Y.2004).

Finally, in deciding a motion to dismiss, this Court may consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed, or knew about and relied upon in bringing the suit. *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996).

### II. The Applicable Securities Laws

#### A. Fraud Claims

Section 10(b) of the 1934 Act provides that no person or entity may, in connection with the purchase or sale of a security, "use or employ ... any manipulative or deceptive device or contrivance" in contravention of an SEC rule. 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful, in connection with the purchase or sale of a security, "(a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or

... omit ... a material fact necessary in order to make the statements made ... not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit up on any person." 17 C.F.R. § 240.10b–5.

To establish liability under Section 10(b), the SEC must show that "in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996) (citing cases). A misrepresentation is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or if the truth had been disclosed. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Further, unlike a private plaintiff, the SEC need not allege or prove reliance, causation, or damages in an action under Section 10(b) or Rule 10b–5. *SEC v. KPMG*, 412 F.Supp.2d 349, 375 (S.D.N.Y.2006) (citing cases).

The elements of a claim under Section 17(a)(1) are "essentially the same" as the elements of a claim under Section 10(b) and Rule 10b–5. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir.1999). Section 17(a) of the 1933 Act makes it unlawful to: "(i) employ any device, scheme, or artifice to defraud, (ii) obtain money or property by means of any untrue statement of material fact or any omission of a material fact that renders the statement made misleading, or (iii) engage in any transaction, practice, or course of business which operates ... as a fraud or deceit in the offer or sale of any security." 15 U.S.C. § 77q(a). While a plaintiff must prove scienter under 17(a)(1), no such

showing is required under Sections 17(a)(2) or (3). *Monarch Funding*, 192 F.3d at 308 (citation omitted).

## B. Record–Keeping Violations

Section 13(b)(2)(A) of the 1934 Act requires public companies to maintain "books, records, and accounts" that accurately and fairly reflect "transactions" and "dispositions of [ ] assets." 15 U.S.C. § 78m(b)(2). Section 13(b)(5) of the 1934 Act provides that "no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" required to be maintained pursuant to Section 13(b)(2). 15 U.S.C. § 78m(b)(2). Rule 13b2–1 provides that "no person shall, directly or indirectly, falsify or cause to be falsified, any book, record, or account" maintained pursuant to Section 13(b)(2)(A). 17 C.F.R. § 240.13b2–1.

## C. Misrepresentations to Auditors

Rule 13b2–2 provides, *inter alia*, that "no officer or director of an issuer, or any other person acting under the direction thereof, shall directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence any ... accountant engaged in the performance of an audit or review of the financial statements ... if that person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading." 17 C.F.R. § 240.13b2–2. "Under Rule 13b2–2, liability attaches when ... someone acting under the direction of an officer or director contribute[s] to the issuance of materially misleading financial statements." *SEC v. 800America.com Inc.*, No. 02 Civ. 9046, 2006 WL 3422670, at *11 (S.D.N.Y. Nov. 28, 2006).

## D. Aider and Abettor Liability

■ Section 20(e) of the 1934 Act provides that any person who "knowingly provides substantial assistance" to another in connection with a violation of the 1934 Act is "deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e). To state an aiding and abetting claim under Section 20(e), the SEC must allege facts showing that: (1) there was a primary violation of the securities laws, (2) the defendant had knowledge of the primary violation, and (3) the defendant provided "substantial assistance" in the primary violation. *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980). The SEC's complaint alleges aiding and abetting violations of Section 10(b) of the 1933 Act, Sections 13(a) and 13(b)(2)(a) of the 1934 Act, as well as aiding and abetting violations of Rules 10b–5, 12b–20, 13a-1, 13a–11, 13a–13 and 13b2–1.

## III. The SEC's Complaint Meets Rule 9(b)'s Heightened Pleading Requirements

### A. Materiality

■ As a threshold matter, the alleged misstatements and omissions-if true-are clearly material. "Although a [financial] restatement is not an admission of wrongdoing, the mere fact that financial results were restated is a sufficient basis for pleading that those statements were false and misleading." *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 437 (S.D.N.Y.2005). Additionally, under Generally Accepted Accounting Principles ("GAAP"), a restatement issues only when errors are material. *Id.* Thus, the fact that AOL restated its revenues to correct for the improper recognition of certain advertising revenues in connection with the transactions detailed in the complaint belies any suggestion that any misstatement or omission was not material.

### B. Pleading with Particularity

■ The SEC's complaint also plainly meets the strictures of Rule 9(b), because it includes "the who, what, when, where and why" of the SEC's claims. *Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir.2004). As described above, the complaint identifies the four particular defendants, and enumerates specific fraudulent acts and statements they made in connection with deals between AOL and Sun, Veritas, HP, Telefonica, and Bertelsmann. (*See Compl.* ¶¶ 60–61, 68–76, 87–95, 98–109.)The complaint identifies the dates of the alleged fraud and offers the defendants' pecuniary gain as motive for the underlying scheme. (*See, e.g., id.* ¶¶ 64, 102–06, 137–39, 144–45, 191–94.) The complaint also provides numerous factual allegations supporting the SEC's assertion that each of the defendants were involved in perpetrating a fraudulent scheme to "cook the books" by inflating online advertising revenues in a series of accounting reports, including several periodic statements submitted to the SEC. (*See, e.g., id.* ¶¶ 60–61, 68–76, 87–95, 98–109, 137, 139, 144.) Further, the complaint alleges that separate and apart from any records violations arising from AOL's internal bookkeeping measures, defendants Kelly and Wovsaniker also made several misstatements to AOL's external auditors at Ernst & Young. (*Id.* ¶¶ 64, 80, 118, 185.) Finally, the SEC alleges that the defendants profited from their actions by selling AOL stock at prices inflated by the fraud and by receiving bonuses from AOL based upon AOL's artificially inflated financial results. (*Id.* ¶¶ 191–94.)

These factual allegations support the SEC's contention that each of the defendants had actual knowledge that they were, in fact, engaged in fraud. And they

are adequately particularlized and more than sufficient to put the defendants on "fair notice" of the SEC's claims. *See SEC v. Collins & Aikman Corp.,* 524 F.Supp.2d 477, 484 (S.D.N.Y.2007).

### B. Scienter

■ The facts alleged in the SEC's complaint clearly establish a strong inference of scienter. Rule 9(b)'s scienter requirement may be satisfied at the pleading stage by alleging particularized facts "(1) showing that defendants had both motive and opportunity to commit fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Telenor E. Invest AS v. Altimo Holdings & Investments, Ltd.,* 567 F.Supp.2d 432, 442 (S.D.N.Y.2008).

■ As the Second Circuit has explained, at least four circumstances necessarily give rise to a strong inference of the requisite scienter, including "where the complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir.2000).

■ In this case, the SEC has alleged that the defendants each intentionally violated the securities laws, and that the defendants each knew that AOL's public statements were inaccurate. The SEC further alleges that each defendant benefited in a concrete way from the fraud by "selling AOL stock at prices inflated by the fraud and by receiving bonuses from AOL based on AOL's artificially inflated financial results." (Compl.¶¶ 191–94.) The Second Circuit has long held that the scienter requirement is satisfied where, as

here, "corporate insiders [are] alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *Id.* at 308. Therefore, drawing all reasonable inferences in favor of the plaintiff, the SEC's complaint plainly states "a right to relief that is plausible on its face." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

### IV. Section 2462's Statute of Limitations Does Not Apply to Equitable Remedies Sought by the SEC

Neither the Securities Act nor the Exchange Act explicitly contains a limitations period; therefore, to the extent that the SEC's claims are subject to a statute of limitations, the catch-all limitations period in 28 U.S.C. § 2462 applies. *SEC v. Jones,* 476 F.Supp.2d 374, 380 (S.D.N.Y. 2007). Section 2462 provides, in relevant part, that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462.

■ The parties do not dispute that section 2462 applies to the SEC's claim for civil penalties. (*See* SEC Mem. at 87.) Rather, they differ on the applicability of section 2462 to the SEC's claim for equitable remedies. However, the great weight of the case law in this jurisdiction supports the SEC's contention that equitable remedies are exempted from section 2462's limitations period. *See, e.g., SEC v. McCaskey,* 56 F.Supp.2d 323, 326 (S.D.N.Y.1999) (injunctive relief, disgorgement, officer and director bar); *SEC v. Schiffer,* No. 97 Civ. 5853, 1998 WL 226101, at *2 & n. 6 (S.D.N.Y. May 5, 1998) (officer and di-

rector bar); *SEC v. Lorin*, 869 F.Supp. 1117, 1120–23 (S.D.N.Y.1994) (injunctive relief and disgorgement). Each of these cases directly addressed the applicability of section 2462 to the very equitable remedies that the SEC seeks here. Accordingly, this Court concludes that section 2462's statute of limitations applies to the SEC's request for civil penalties but not to its request for permanent injunctive relief, disgorgement, or an officer and director bar.

## V. The Tolling Agreements Clearly Suspended the Statute of Limitations

Somewhat remarkably, the defendants suggest that section 2462's limitations period was not extended by the tolling agreements they entered into with the SEC. Specifically, the defendants argue that once the tolling agreements lapsed, the situation revered to the *status quo ante*, as if there had never been tolling agreements in the first place; they reject the notion that the running of the statute was suspended for the period that the tolling agreements were in effect and argue that, on the day the agreements lapsed, the years during which the statute was tolled were once again deemed part of the five-year limitations period. (*See* Kelly Mem. at 10; Rindner Mem. at 25 n. 16; Ripp Mem. at 29; Wovsaniker Mem. at 35.)

Defendant Wovsaniker takes this argument one step further. With little candor and less logic, he quotes selectively from *Black's Law Dictionary* to concoct an argument that "tolling" has nothing to do whatsoever with suspending a statute of limitations. (Wovsaniker Mem. at 36.) He argues that "tolling" is more "logically defined as the taking away of a right." (*Id.*) According to Mr. Wovsaniker, that right can be only "his right to raise a defense," because "nothing in the tolling agreement discusses an extension of time to file suit or refers to the suspension of the limitations period." (*Id.*)

This Court flatly rejects both arguments as ridiculous and unworthy of the lawyers who propounded them.

 During the period the tolling agreements were in effect, the statute of limitations stopped running. When the tolling agreements expired, the statute of limitations began to run again. If the statute was tolled (suspended) on Year 4, Day 20, then the first day after the agreements expired was Year 4, Day 21. This interpretation comports with the ordinary understanding of the term, "tolling agreement," which *Black's Law Dictionary* defines as: "An agreement between a potential plaintiff and a potential defendant by which the defendant agrees to *extend* the statutory limitations period on the plaintiff's claim, usu. so that both parties will have more time to resolve their dispute without litigation." *Black's Law Dictionary* 1495 (7th ed.1999) (emphasis added). Any other interpretation would undo the "toll" and eviscerate the purpose of the agreement, which is to extend the time for bringing suit.

## VI. The SEC's Claim for Civil Penalties Is Timely

Applying section 2462's limitations period to the SEC's claim for civil penalties, the relevant accrual cut-off dates are as follows:
- Kelly: May 11, 2002
- Rindner: October 8, 2001
- Ripp: May 10, 2002
- Wovsaniker: April 30, 2002

The SEC argues that these dates are not firm liability cut-offs, because the defendants were a part of an integrated, fraudulent scheme that lasted until at least November 14, 2002, which is well-within the

limitations period as extended by the tolling agreements. (*Id.* ¶ 144; SEC Mem. at 97.) The SEC contends that the "continuing violation doctrine" operates to eliminate any staleness concerns with the claims relating to transactions that occurred prior to the November 14, 2002 date, because "as a matter of law, the last step in a 'scheme to defraud,' the last stage of a 'continuing violation,' can bring the entire scheme within the applicable statue of limitations." (SEC Mem. at 98.) Indeed, "where a violation, occurring outside of the limitations period, is so closely related to other violations, not time-barred, as to be viewed as part of a continuing practice such that recovery can be had for all violations." *Schiffer*, 1998 WL 226101, at *3.

■ Although the continuing violation doctrine can bootstrap otherwise time-barred claims into the limitations period, it applies only to "continual unlawful acts, not continual ill effects from a single violation." *SEC v. Jones*, No. 05 Civ. 7044, 2006 WL 1084276, at *4 (S.D.N.Y. Apr. 25, 2006) (denying motion to dismiss). In this case, the SEC has alleged "a continuous, integrated scheme that [was] operated by the same group of people-Kelly, Rindner, Ripp, and Wovsaniker-over a period of time to achieve the same purpose-to artificially inflate AOL's advertising revenue." (SEC Mem. at 100.) As alleged in the complaint, the effects of the scheme lasted through 2003, with the last affirmative misstatement being the filing of a false and misleading form 10–Q in connection with the Bertelsmann deal on November 14, 2002. (Compl.¶ 144.) Accordingly, the SEC's civil penalty claims were timely filed—even though they were not filed until May 19, 2008—because the five-year statute of limitations was tolled for a period of at least one year as to each defendant (*see supra* at 18).

### CONCLUSION

Defendants' motions to dismiss (Docket Nos. 31, 34, 35, and 41) are denied in their entirety. The Clerk of the Court should immediately remove these motions from the Court's outstanding motion list.

This constitutes the decision and order of this Court.