SECURITIES and EXCHANGE COMMISSION, Plaintiff,

v.

John Michael KELLY, Steven E. Rindner, and Mark Wovsaniker, Defendants.

No. 08 Civ. 4612 (CM)(GWG).

United States District Court, S.D. New York.

Jan. 7, 2011.

David Frohlich, Jeffrey Brian Finnell, John J. Bowers, Melissa A. Robertson, Richard S. Hong, Richard Edward Simpson, Scott W. Friestad, Thomas D. Manganello, John David Worland, Jr., Securities and Exchange Commission, Washington, DC, for Plaintiff.

Andrew J. Ceresney, Bruce E. Yannett, Erik Bierbauer, Debevoise & Plimpton, LLP, Gregory Gene Little, Scott Edward Hershman, White & Case LLP, Stephen Roy Blacklocks, Hunton & Williams, LLP, Andrew Lee Morrison, K & L Gates LLP, New York, NY, Glenn R. Reichardt, Bethany M. Nikfar, Erin Ardale Koeppel, Stephen Gregory Topetzes, K & L Gates, Emily S. Pierce, Ada Fernandez Johnson, John V. Ponyicsanyi, Jonathan Rosser Tuttle, Debevoise & Plimpton LLP, Timothy Patrick Peterson, Murphy & McGonigle P.C., Anthony Rapa, Erin S. Vagley, Jennie Kneedler, Jeremy D. Engle, Patrick F. Linehan, Jonathan Drimmer, Mark J. Hulkower, Robert Moore, Steptoe & Johnson, L.L.P., Bonnie K. Arthur, Hunton & Williams LLP, Washington, DC, for Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

McMAHON, District Judge.

On May 19, 2008, the Securities and Exchange Commission ("SEC") commenced this action against John Michael Kelly, Steven E. Rindner, and Mark Wovsaniker (collectively, the "Defendants"), who are former senior managers of America Online, Inc. ("AOL") and its successor corporation Time Warner, Inc. ("Time Warner"). (Compl. ¶ 1.) The SEC alleges that between 2000 and 2003, Defendants engineered a series of so-called "round-trip transactions" with more than a half-dozen companies, enabling AOL to report approximately one billion dollars in online advertising revenue improperly. (Id. ¶¶ 6, 7, 25, 53.) Presently before the Court are separate motions for summary judgment filed by Kelly, Rindner, and Wovsaniker.

For the reasons that follow, Wovsaniker's, and Rindner's motions for summary judgment are denied. Kelly's motion for summary judgment on the SEC's first, second, third and seventh causes of action is denied. Kelly's motion for summary judgment on the SEC's fourth, fifth, and sixth causes of action is granted. Rindner's and Kelly's motions to dismiss the SEC's request for disgorgement is granted.

## BACKGROUND

On January 10, 2000, America Online, Inc. ("AOL") and Time Warner, Inc. ("Time Warner") announced a plan to merge. (SEC's Rule 56.1 Statement of Material Facts ("SEC 56.1") ¶ 1.) The merger was consummated on January 11, 2001, and the two companies became AOL Time Warner, Inc. ("AOLTW"). (Id.) All three Defendants were employed at AOL and, following the merger, became employees of AOLTW.

At the heart of this litigation are ten "concurrent" or "round-trip" transactions that AOL entered into with counterparties between 2000 and 2003, whereby AOL allegedly improperly inflated its advertising revenue by directly or indirectly funding another company's purchase of online advertising. (Compl. ¶ 25; 34; see also SEC v. Kelly, 663 F.Supp.2d 276, 279 (S.D.N.Y. 2009).)

### I. The Defendants

#### A. John Michael Kelly

John Michael Kelly was hired by AOL in June 1998 and became the company's Chief Financial Officer ("CFO") in July 1998. (Kelly's Rule 56.1 Statement of Undisputed Facts ("Kelly 56.1") ¶ 1.) Following the merger of AOL and Time Warner. Kelly remained CFO of AOLTW. (Id. ¶ 3.) Kelly was CFO of AOLTW until October 2001, at which time he returned to

AOL (now a division of AOLTW) to become the Chief Operating Officer ("COO"). (*Id.* ¶ 5.) In December 2002, Kelly became the Chairman and Chief Executive Officer ("CEO") of AOL International and AOL Web Services. (*Id.* ¶ 6.) Kelly left AOLTW in March 2005. (*Id.* ¶ 7.)

### B. *Mark Wovsaniker*

Mark Wovsaniker is a certified public accountant who worked at the accounting firm Ernst & Young LLP ("E & Y") for 22 years prior to joining AOL. (Wovsaniker's Rule 56.1 Statement of Undisputed Facts ("Wovsaniker 56.1") ¶¶ 23–24.) E & Y was AOL's outside auditor, and while at E & Y, Wovsaniker was the audit partner on the AOL account. (Wovsaniker's 56.1 ¶ 26; Kelly's 56.1 ¶ 15.)

In June 1999, Wovsaniker joined AOL as Vice President of Accounting Policy. (Wovsaniker's 56.1 ¶ 27.) At that time, Wovsaniker reported to AOL's then-Controller James MacGuidwin, and from January 2001 to May 2003, Wovsaniker reported to AOL's then-CFO Joseph Ripp. (*Id.* ¶ 30.) In his role as Vice President, and later as Senior Vice President of Accounting Policy, Wovsaniker was head of AOL's Accounting Policy group. (*Id.* ¶ 29.) Wovsaniker left AOL in November 2007. (*Id.* ¶ 36.)

AOL's Accounting Policy group consisted of three or four accountants whose primary function was to provide accounting consultation and guidance to AOL's accountants, lawyers, and business personnel regarding investments, acquisitions, and various AOL transactions. (*Id.* ¶ 37.) All members of the Accounting Policy group reported to Wovsaniker. (*Id.* ¶ 38.) During deal negotiations, employees from AOL's Business Affairs group consulted Wovsaniker and other members of the Accounting Policy group regarding the accounting implications of certain transactions. (*Id.* ¶ 40.)

### C. *Steven E. Rindner*

Before joining AOL in 1999, Rindner was an Assistant United States Attorney for the District of Columbia and spent several years working as an associate at two law firms. (Rindner's Rule 56.1 Statement of Undisputed Facts ("Rindner's 56.1") ¶ 1; SEC's 56.1 ¶¶ 48, 50.) On October 25, 1999, Rindner joined AOL in a non-legal capacity as a member of the Interactive Marketing subgroup of the Business Affairs group. (Rindner's 56.1 ¶ 4.) Rindner joined AOL as a Director and in 2000, was promoted to Executive Director in the Business Affairs group. (*Id.* ¶¶ 7–8.) In 2001, Rindner was promoted to Vice President in the Business Affairs group (*id.* ¶ 10) and in December 2001, Rindner was promoted to Senior Vice President in the Business Affairs group (*id.* ¶ 13). Rindner left AOLTW in 2003. (*Id.* ¶ 16.)

The Business Affairs group was tasked with helping other AOL divisions coordinate and negotiate deals. (*Id.* ¶ 19.) The group's provided assistance on deals that involved, for example, AOL selling online advertising or AOL purchasing technology or other services. (*Id.* ¶ 20.)

As part of his responsibilities in the Interactive Marketing subgroup, in 2000, Rindner was responsible for overseeing the "Interactive Marketing Weekly Meeting Reports," also known as "pipeline reports." (*Id.* ¶ 24.) The weekly pipeline report tracked more than one hundred potential advertising transactions being negotiated by AOL with counterparties. (*Id.* ¶ 25.) For each potential deal, the pipeline report identified various metrics, including the deal size and anticipated revenue, the deal term and the identities of AOL personnel involved in the negotiations. (*Id.* ¶ 26.) To fulfill his pipeline

role, Rindner obtained certain information from the deal negotiators within the Business Affairs group. (*Id.* ¶ 27.) Rindner also attended meetings with accounting, finance, and other departments where they discussed the status of potential transactions in the pipeline. (*Id.* ¶ 30.)

## II. THE TRANSACTIONS

The SEC challenges the bona fides of transactions between AOL and various suppliers or customers. The common thread in each case is that AOL purportedly declined discounts or lower prices for goods, services, or the settlement of disputes and instead paid inflated prices that were offset, dollar for dollar, by sums ostensibly paid for online advertising. This advertising "revenue" artificially inflated AOLTW's bottom line during 2000, 2001, 2002, and 2003. These sorts of transactions are colloquially referred to as "round trip" transactions.

### 1. *Sun Microsystems, Inc. (June 2000)*

Sun Microsystems, Inc. ("Sun") was a hardware supplier that manufactured network equipment, which AOL used to support its online services. (SEC's 56.1 ¶ 74.) In November 1998, AOL contracted to purchase $300 million in hardware from Sun over three years, and Sun agreed to purchase $60 million in advertising from AOL in the same period. (Kelly's 56.1 ¶ 37.) Under the 1998 joint-venture agreement, AOL received discounts on hardware ranging from 15% to 45%. (*Id.* ¶ 38.) The agreement also provided that AOL would receive the best pricing available from Sun. (*Id.*)

By May 2000, AOL had satisfied its hardware purchase commitment under the 1998 agreement, but still needed to purchase additional hardware from Sun. (*Id.* ¶¶ 40–41.) In early spring 2000, AOL and Sun began discussions, involving Kelly and

other AOL executives, about a potential restructuring of the joint-venture arrangement. (*Id.* ¶ 39.)

The SEC claims that AOL did not need to enter into a new agreement in order to obtain the additional equipment it needed from Sun at a discount rate because it could have purchased that equipment under the 1998 joint-venture agreement. (SEC's 56.1 ¶ 76.)

The SEC maintains that Kelly and Wovsaniker knew, based on discussions with Sun, that Sun had offered to compensate AOL for large equipment purchases by returning a significant portion of Sun's gross margin on the purchase to AOL—a discount in excess of the discount AOL was receiving under the 1998 agreement. (SEC's 56.1 ¶ 77.) Rather than purchasing the additional equipment under the existing agreement, AOL negotiated a new purchase commitment with Sun. (SEC's 56.1 ¶ 79.)

In discussions over a potential restructuring of the joint-venture agreement, Jay Rappaport of the Business Affairs group and Terry Laber of the Systems Operations group were the lead negotiators for AOL. (Kelly's 56.1 ¶ 47.) In a June 1, 2000 email exchange, Kelly, Wovsaniker and others discussed potential "alternative" deal structures whereby Sun could purchase advertising from AOL as one means of converting Sun's proposed discount into revenue AOL could recognize. (SEC's 56.1 ¶ 82.) Internal Sun emails from June 2000 confirm that AOL told Sun that it needed revenue back from Sun—instead of a discount—in exchange for AOL's commitment to purchase additional equipment. (*Id.* ¶ 85.) The same emails demonstrate that AOL understood that Sun's advertising purchase would be in the amount of the 15% discount Sun had proposed. (*Id.*)

On or around June 20, 2000, Rappaport updated Kelly on the status of the negotiations. (*Id.* ¶ 51.) Rappaport told Kelly that the terms of the hardware and advertising purchases would remain exactly the same under the proposed transaction as they were in the 1998 agreements—including the existing discounts on hardware purchases and AOL's right to receive Sun's best possible price. (*Id.*) The deal summary, which was circulated within AOL, contained references to both the hardware-purchase agreement and the advertising agreement, and did not refer to an additional discount offered by Sun or forgone by AOL. (Kelly's 56.1 ¶¶ 57–58.)

On June 30, 2000, Sun and AOL executed a final agreement. In that agreement, AOL agreed to purchase an additional $250 million in hardware and Sun agreed to purchase $37.5 million in advertising. (*Id.* ¶ 54.) The SEC claims that the $37.5 million purchase of advertising by Sun was in fact the 15% discount ($37.5 million) that AOL gave up so that Sun would purchase advertising. (SEC's 56.1 ¶¶ 96–97.)

AOL recognized advertising revenue of $37.5 million from the Sun agreement in the quarter ended September 30, 2000. (*Id.* ¶ 98.) Kelly and Wovsaniker personally considered and approved AOL's entry into and accounting for the Sun transaction. (*Id.* ¶¶ 99, 102.)

In 2002, in response to the SEC's commencement of a formal investigation into AOLTW's accounting practices, AOLTW created a "CFO review" team. (Kelly's 56.1 ¶¶ 27–29.) The CFO Review team commenced an internal review of the appropriateness of the historical accounting for advertising revenues recognized at AOL from July 1999 through March 2002. (*Id.* ¶ 29.) In October 2002, the CFO Review team concluded that AOL had improperly accounted for the Sun transaction. (Kelly's 56.1 ¶ 71.) On January 28, 2003, AOLTW restated its financial statements to correct its accounting for the $37.5 million received from Sun. (SEC's 56.1 ¶ 105.)

### 2. *Veritas Software Corporation*

Veritas Software Corporation ("Veritas") created and licensed data-storage software. (SEC's 56.1 ¶ 121.) In August 2000, AOL and Veritas were negotiating a software licensing agreement. (*Id.* ¶ 122.) Prior to signing a final agreement, AOL and Veritas reached a preliminary agreement, with AOL paying $30 million to purchase an unlimited software license from Veritas. (*Id.* ¶ 124.) But one week before the deal with Veritas was scheduled to close, the SEC claims that AOL's Business Affairs group intervened in order to extract advertising revenue from the transaction. (*Id.* ¶ 126.)

The SEC claims that AOL sought to pay an additional $20 million for the $30 million software license ($50 million in total) so that Veritas would simultaneously purchase $20 million in advertising from AOL. (*Id.* ¶¶ 128–29.) The SEC contends that Wovsaniker was consulted by the Business Affairs group on how to structure the deal so as to be able to recognize advertising revenue; that Wovsaniker approved the recognition of advertising revenue on the Veritas transaction; and that AOL had proposed paying an additional $20 million for the software license in order to have Veritas purchase $20 million in advertising. (*Id.* ¶¶ 130–33.)

In the final agreement, AOL paid $50 million for a perpetual right-to-use license from Veritas. (Kelly's 56.1 ¶ 77; Wovsaniker's 56.1 ¶ 108.) At the same time that AOL and Veritas signed the software-license agreement, Veritas agreed to purchase $20 million in advertisements from AOL. (Kelly's 56.1 ¶ 77; Wovsaniker's 56.1 ¶ 108.)

The SEC alleges that Wovsaniker instructed the Business Affairs group to draft separate deal summaries for the license and advertising agreements to make it appear that the two agreements were not linked but rather separate non-contingent transactions. (SEC's 56.1 ¶ 134.)

During its audit of AOL's December 31, 2000 financial statements, E & Y raised questions about the recognition of $20 million in advertising revenue related to the agreement with Veritas. (*Id.* ¶ 138.) When Wovsaniker met with E & Y to discuss the appropriate accounting treatment for the Veritas agreements, the SEC claims that Wovsaniker did not inform E & Y that the software license agreement with Veritas was worth less than $50 million, and that AOL had paid $50 million rather than $30 million for the license agreement to induce Veritas to purchase $20 million in advertising. (*Id.* ¶¶ 145–47.)

On January 28, 2003, AOLTW restated its financial statements to correct its accounting for the Veritas transaction. (*Id.* ¶ 156.)

### 3. *Hewlett–Packard*

In 2000, AOL and Hewlett–Packard ("HP") were negotiating a new server hardware agreement. The SEC claims that Wovsaniker instructed the Business Affairs group to use the Sun transaction as a model for an agreement with HP. (*Id.* ¶¶ 162–164.) Following Wovsaniker's guidance, the Business Affairs group negotiated with HP for an advertising commitment instead of accepting the lower prices HP offered on the hardware AOL needed to purchase. (*Id.* ¶ 165.) The SEC claims that during negotiations, HP offered AOL a 44% discount on hardware, an increase from AOL's then-current 38% discount, but AOL traded the incremental discount for HP's commitment to purchase $12 million in advertising. (*Id.* ¶¶ 166–67.) The SEC contends that the $12 million spent by HP on online advertising represents the difference in value between the actual agreed-to discount rate (from a prior agreement with HP) and the higher incremental discount rate offered by HP during negotiations. (*Id.* ¶ 167.)

In November 2000, AOL and HP entered into concurrent transactions. AOL committed to purchase $200 million in hardware from HP by December 31, 2001, and HP committed to purchase $12 million in online advertising from AOL. (Kelly's 56.1 ¶ 90.)

The SEC concedes that Kelly was not involved in any contemporaneous discussions about the transactions or negotiations with HP. (Kelly's 56.1 ¶¶ 91, 93.) The SEC maintains that Wovsaniker approved AOL's entry into and accounting for the HP transaction. (SEC's 56.1 ¶ 173.) The SEC also claims that the Business Affairs group falsely documented the HP transaction at Wovsaniker's direction. (*Id.* ¶ 174.) Specifically, the SEC claims that the hardware purchase agreement did not mention the contemporaneous advertising deal; that the advertising agreement did not mention the hardware purchase agreement; and that the agreements (and deal summaries) did not mention the larger discount AOL had turned down. (*Id.* ¶¶ 175–177, 179.)

In November 2002, E & Y concurred with AOLTW's decision to restate the advertising revenue it had recognized as a result of the HP transaction. (*Id.* ¶ 192.)

### 4. *Telefonica DataCorp*

Telefonica DataCorp, S.A. ("Telefonica") provided network services to several international affiliates of AOL. (*Id.* ¶ 194.) In 2000, AOL wanted lower prices from Telefonica, which Telefonica agreed to give in exchange for a network commitment. (*Id.*

¶ 195.) Rindner led negotiations to secure a "global deal" with Telefonica. (*Id.* ¶ 196.)

According to the SEC, during negotiations, Rindner considered two structures for an agreement with Telefonica: (1) Telefonica could provide AOL with a credit or rebate on the network agreement, or (2) Telefonica could buy AOL advertising in an amount equal to the difference between the price AOL was currently paying and the lowest price Telefonica could offer. (*Id.* ¶ 199.) The SEC claims that Rindner and Wovsaniker discussed how to "document" a transaction that involved Telefonica purchasing AOL advertising. (*Id.* ¶¶ 200–01.)

The SEC alleges that Rindner understood the contingent nature of the advertising deal and the network commitment. (*Id.* ¶ 208.) The SEC claims that Rindner advised others within the Business Affairs group to avoid cross-referencing the advertising and network-services agreements in documents to prevent accountants from asking "questions" about AOL's revenue recognition. (*Id.* ¶¶ 210–212.) The final agreement between AOL and Telefonica did not cross-reference the network and advertising agreements. (*Id.* ¶ 215.)

In December 2000, AOL and Telefonica entered into three agreements, including a Master Letter Agreement and two advertising insertion orders. (Wovsaniker's 56.1 ¶ 136.) AOL agreed to purchase $250 million of network services from Telefonica and Telefonica purchased $25 million in advertising from AOL. (Kelly's 56.1 ¶ 102.) The SEC claims that Wovsaniker "signed-off" and approved the Telefonica agreements. (SEC's 56.1 ¶ 216.) The SEC also claims that Kelly approved the Telefonica deal and was aware of the tie between the network-services agreement and the advertising agreement. (*Id.* ¶ 219.)

The CFO Review team concluded that AOL's original accounting for the agreements was appropriate. (Kelly's 56.1 ¶ 108.) AOLTW did not restate the Telefonica transaction; E & Y concurred in that decision. (*Id.* ¶ 109.)

### 5. *Ticketmaster*

Prior to AOL's acquisition of MovieFone in 1999, MovieFone had commenced an antitrust suit against Ticketmaster Corporation ("Ticketmaster"), one of its competitors. (SEC's 56.1 ¶¶ 248, 253.) The dispute arose from a 1992 joint venture agreement between Pacer/CATS (in which Ticketmaster purchased a controlling interest) and MovieFone. (*Id.* ¶¶ 244, 246.) Under the 1992 joint venture, Pacer/CATS agreed to provide movie teleticketing services to MovieFone. (*Id.* ¶ 244.) MovieFone alleged that when Ticketmaster bought a controlling interest in Pacer/CATS in 1994, Pacer/CATS stopped performing under the terms of the 1992 joint venture. (*Id.* ¶ 246.)

In June or July 2000, Garret Rasmussen—outside counsel for MovieFone—initiated settlement discussions with Ticketmaster. (*Id.* ¶ 254.) Ticketmaster was receptive to a settlement and responded with an offer of $10.5 million to resolve all outstanding litigation between Ticketmaster and MovieFone/AOL. (*Id.* ¶ 256.) Subsequently, James Patti, a member of the Business Affairs group, was told to work with Rasmussen to "transition" the settlement with Ticketmaster into an advertising agreement. (*Id.* ¶ 260.) According to the SEC, MovieFone/AOL proposed the following to Ticketmaster to settle the dispute: Ticketmaster would pay MovieFone $12.5 million to resolve all outstanding litigation between the parties; AOL would provide online advertising to Ticketmaster; and AOL would purchase $2 million in advertising from Ticketmaster (via USA

Networks—a Ticketmaster affiliate). (*Id.* ¶ 261.) The SEC claims that an August 15, 2000 email from Patti to David Colburn (President of AOL's Business Affairs group), explained that Ticketmaster was willing to settle the dispute with a cash settlement payment. (*Id.* ¶¶ 266–67.) This email was forwarded to Kelly. (*Id.*)

On August 17, 2000, AOL and Ticketmaster entered into an agreement, whereby Ticketmaster purchased $12.5 million in advertising from AOL and AOL purchased $2 million in advertising from USA Networks, a Ticketmaster affiliate. (Kelly's 56.1 ¶ 111; SEC's 56.1 ¶ 272.)

Patti consulted with Wovsaniker to determine whether AOL could recognize online advertising revenue based on the planned settlement with Ticketmaster. (SEC's 56.1 ¶ 263.) In Patti's documents summarizing the settlement with Ticketmaster, Wovsaniker is listed as a required signoff, and the SEC claims that Wovsaniker approved recognition of the $12.5 million in advertising revenue. (*Id.* ¶¶ 269, 278.) AOL recognized the $12.5 million as advertising revenue in the first quarter of 2000. (*Id.* ¶ 277.) A summary of the settlement agreement was sent to Kelly with a statement by an AOL executive in the Business Affairs group explaining, "This is how we are hitting our numb[ers]." (*Id.* ¶ 270.)

In 2002, the CFO Review team discovered that Ticketmaster was willing to settle the dispute with MovieFone without an advertising deal (*i.e.,* by paying AOL $10.5 million outright), and that E & Y was not told of MovieFone's cash offer during their audit of the transaction. (*Id.* ¶¶ 286–87.) On January 28, 2003, AOLTW restated the revenue it recognized in connection with the Ticketmaster settlement. (*Id.* ¶ 288.)

### 6. *Wembley*

The dispute between AOL and Wembley, PLC ("Wembley") also arose out of the same 1992 joint-venture agreement between Pacer/CATS and MovieFone discussed above. (*Id.* ¶¶ 244, 253.) In 1994, MovieFone initiated arbitration proceedings against Pacer/CATS based on violations of the joint-venture agreement, and in 1997, MovieFone won an arbitration award of approximately $22.8 million against Wembley. (*Id.* ¶¶ 247, 249.)

After the settlement with Ticketmaster was finalized, Patti was instructed to focus his attention on Wembley. (*Id.* ¶ 293.) Working with Patti, Rasmussen asked Wembley for payment of the full amount of the arbitration award. (*Id.* ¶¶ 297–98.) In a September 6, 2000 email, Patti informed Kelly and Wovsaniker that Wembley was willing to pay AOL the full amount of the arbitration award. (*Id.* ¶ 204.) The SEC claims that Patti did not withhold any information from Wovsaniker regarding the settlement negotiations with Wembley and Patti denies telling Wovsaniker that Wembley was unwilling to pay the full amount of the arbitration award. (*Id.* ¶ 306.)

The SEC claims that, during negotiations, Rindner and Patti emphasized the fact that AOL's primary focus was recognition of advertising revenue. (*Id.* ¶ 311.) In September 2000, Kelly and Rindner participated in an email discussion about AOL's plan to use advertising deals, like Wembley, to meet AOL's revenue targets. (*Id.* ¶ 319.)

In October 2000, AOL and Wembley settled their legal dispute. Wembley agreed to purchase $23.8 million in advertising from AOL. (Kelly's 56.1 ¶ 123.) According to the SEC, Wovsaniker approved AOL's recognition of the $23.8 million as advertising revenue despite knowing that the advertising deal was "a good faith gesture" and that Wembley was willing to settle the dispute in cash. (SEC's 56.1

¶¶ 323, 301–02.) The SEC claims that, from Wembley's perspective, the transaction with AOL was a legal settlement rather than a bona fide advertising purchase. (*Id.* ¶ 320.)

In January 2001, Wembley contacted AOL to begin running the advertising contemplated in the settlement agreement. (*Id.* ¶ 329.) But prior to January 2001, AOL had already run all of the advertising Wembley purchased as a result of the settlement agreement, without Wembley's knowledge or approval. (*Id.* ¶ 330.) The SEC claims that Wovsaniker and Rindner knew that AOL had run Wembley's advertising without notice and did not correct AOL's recognition of the revenue recognition. (*Id.* ¶¶ 334–35.)

In October 2000, E & Y reviewed AOL's revenue recognition with respect to the Wembley settlement and concurred with AOL's accounting treatment. (*Id.* ¶¶ 325, 327.) According to the SEC, E & Y approved the recognition of $23.8 million as revenue because it believed, based on discussions with Wovsaniker, that Wembley was unwilling to pay the settlement amount before AOL offered online advertising. (*Id.* ¶ 326.) E & Y ultimately concluded that it could no longer rely on Wovsaniker's opinion because he did not disclose relevant information regarding the Wembley settlement during E & Y's audit, (*Id.* ¶ 338.) In 2002, the CFO Review team concluded that AOL should restate its accounting for the Wembley settlement and E & Y concurred. (*Id.* ¶¶ 336–37.) On January 28, 2003, AOLTW restated its financial results for 2000, 2001, and 2002, including the advertising revenue it recognized in connection with the Wembley settlement. (*Id.* ¶ 339.)

### 7. *WorldCom, Inc. June 2001 Network Services Agreement ("WorldCom I")*

WorldCom, Inc. ("WorldCom") provided telecommunications services to individual and business customers, including AOL. (*Id.* ¶ 343.) After AOL and Time Warner merged, WorldCom continued to provide telecommunications services to AOLTW. (*Id.*)

In March 2000, AOL and UUNET Technologies, a wholly owned subsidiary of WorldCom, entered into a series of agreements relating to modem services (the "Network Services Agreements"). (*Id.* ¶ 344.) After the Network Services Agreements were signed, prices for modem services in the telecommunications market collapsed, and AOL invoked the market-pricing provision in the agreement. (*Id.* ¶ 345.)

Based on the market-pricing provision, in June 2000, AOL demanded that WorldCom reduce "port prices" from $36.10 to $27.35, and in December 2000, AOL requested that port prices be further reduced to $26.35. (*Id.* ¶ 346.) WorldCom resisted that the market price should be higher but AOL nonetheless paid the lower prices and withheld the difference. (*Id.* ¶¶ 347–48.) AOL also accrued an expense in case WorldCom prevailed in the market-pricing dispute. (*Id.* ¶ 348.)

In early 2001, AOL and WorldCom representatives discussed how to resolve the pricing dispute. (*Id.* ¶ 350.) On February 22, 2001, Kelly and others from AOL met with WorldCom's CEO, Bernie Ebbers. (*Id.* ¶ 353.) The SEC maintains that AOL's goal was to extract an advertising deal from WorldCom in exchange for concessions by AOL on the existing Network Services Agreement. (*Id.* ¶¶ 355–56, 360.) In an email sent by Andrew Haire, a member of AOL's Business Affairs group, to Ebbers and others at WorldCom, AOL proposed accepting a higher rate than the lower "market rate" it was claiming under the market-pricing provision of the Net-

work Services Agreement. (*Id.* ¶¶ 361–62.) In exchange, AOL sought a commitment from WorldCom to spend $250 million in advertising on AOLTW properties or an amount equal to approximately 20% of WorldCom's total marketing budget. (*Id.* ¶ 361.)

On March 1, 2001, representatives from AOL and WorldCom (including Kelly) met to discuss the terms of the Network Services Agreement and the pricing dispute. By early March 2001, WorldCom had agreed to waive all or most of the amount accrued with respect to the pricing dispute (*i.e.*, the amount AOL had withheld as a result of paying the lower port prices). (*Id.* ¶ 368.) By March 9, 2001, AOL had the following internal proposal for resolving the WorldCom dispute:

1. AOL claimed that $30.2 million was withheld based on the market-rate dispute;

2. AOL proposed paying WorldCom $25 million to resolve the market-rate dispute with WorldCom paying $25 million back to AOL for additional advertising during the current quarter;

3. AOL proposed setting fixed port prices for 2001 through 2004 and agreed to eliminate further market-price adjustment during the term of the revised Network Services Agreement;

4. AOL agreed to forgo current anticipated volume discounts and proposed that WorldCom agree to eliminate AOL's purchase commitments; and

5. AOL proposed that WorldCom spend $275 million in AOLTW advertising, with $27.5 million of that amount to be spent online.

(*Id.* ¶ 369.) On May 6, 2001, Haire communicated the following proposal to World-Com: (1) AOL's "net giveback of $180 million" (in discounts given up); (2) AOL pays $30 million to WorldCom to resolve the pricing dispute and WorldCom buys advertising in the same amount; and (3) WorldCom spends 18% or ($50 million) of the proposed $275 million advertising purchase in online advertising. (*Id.* ¶¶ 373–74.) The SEC claims that Wovsaniker, Rindner, and Kelly were involved or kept abreast of the negotiations with World-Com. (*Id.* ¶¶ 370–73, 379.) According to the SEC, a May 7, 2001 email from David Colburn, President of the Business Affairs group, makes clear that AOL was trading discounts from WorldCom for advertising revenue: "1 have all my sign-offs from corporate—which I needed re [sic] how we are setting up the ad buy to take care of AOL shortfalls—so we can run this down and close it." (*Id.* ¶ 375.)

The SEC claims that, as negotiations progressed, Rindner and Wovsaniker continued to receive detailed information showing the link between the Network Services Agreement and the advertising component of AOL's negotiations with WorldCom. (*Id.* ¶ 382.) Emails received by Rindner also show that AOL ran advertising for WorldCom before an agreement was finalized so that AOL could recognize advertising revenue in the second quarter of 2001. (*Id.* ¶ 383.)

According to the SEC, WorldCom was willing to resolve the pricing dispute for an $11 million payment from AOL ($5 million in cash, plus $6 million in reductions on future advertising spending). (*Id.* ¶ 386.) WorldCom would also waive the rest of the accrued amount AOL owed as a result of the pricing dispute. (*Id.*) But the SEC claims that AOL insisted on paying the full liability that had accrued (approximately $35 million) so that WorldCom could purchase advertising in the same amount (less

a $5 million cash payment from AOL). (*Id.* ¶ 386.) Kelly approved this approach:

> [WorldCom] and AOL agree that AOL will pay [WorldCom] the disputed amount. [WorldCom] will pay the total disputed [amount] LESS $5M in ads— approved by Kelly ... $34.2MM would make the quarter.

(*Id.* ¶ 387.) Shortly before an agreement was reached with WorldCom, AOL agreed to increase the amount it would pay WorldCom to resolve the pricing dispute: AOL agreed to pay $39.2 million to World-Com and WorldCom would purchase $34.2 million in advertising (because $5 million of the $39.2 million paid by AOL was intended as a cash payment to WorldCom), (*Id.* ¶ 388.)

In June 2001, AOL and WorldCom entered into a series of agreements that resolved the pricing dispute. (*Id.* ¶ 391.) WorldCom committed to purchase a total of S302.7 million in advertising on AOLTW properties, including $34.2 million of advertising to be delivered before the end of June 2001 ($21 million in AOL online advertising and $13 million in advertising with other AOLTW properties). (*Id.* ¶ 393.) The remaining $268.5 million of advertising (including 20% to be purchased from AOL as online advertising) was to be delivered between July 1, 2001, and December 31, 2004. (*Id.* ¶ 393.) Wovsaniker and Kelly both approved the WorldCom transaction. (*Id.* ¶¶ 387, 390.) According to the SEC, Wovsaniker did not disclose to E & Y the contingent nature of the Network Services Agreement and WorldCom's willingness to waive all except $11 million of the amount AOL owed as a result of the pricing dispute. (*Id.* ¶ 395.)

In 2002, the CFO Review team concluded that AOL had improperly recognized advertising revenue on the WorldCom transaction. (*Id.* ¶ 400–02.) In January 2003, AOLTW restated its revenue recognition in connection with the June 2001 WorldCom agreements, (*Id.* ¶ 410.)

### 8. *WorldCom December 2001 ("World-Com II")*

During 2001, CompuServe Europe ("CompuServe"), a wholly owned subsidiary of AOL Europe S.A. ("AOL Europe"), was unable to meet its purchase commitments under a 1998 network services agreement with UUNET, a subsidiary of WorldCom. (*Id.* ¶ 415; Kelly's 56.1 ¶ 153.) By the fall of 2001. AOL Europe had accrued a $17 million liability in anticipation of a penalty payment to WorldCom. (Kelly's 56.1 ¶ 154.)

At the same time that AOL was attempting to resolve the AOL Europe penalties, AOL and WorldCom were also in the midst of negotiating a 2–year agreement for the provision of toll-free telecommunications services for AOLTW (the "Voice/Data Agreement"). (SEC's 56.1 ¶ 430.) By September 2001. WorldCom agreed to forgive the $17 million AOL Europe accrued liability in exchange for AOL's agreement to add an additional year to the AOLTW Voice/Data Agreement (with no request to purchase additional advertising). (*Id.* ¶¶ 431–32.) AOL and WorldCom disagreed over the total amount that WorldCom would waive: WorldCom could waive the $17 million liability that had accrued by the end of the third quarter of 2001 or it could waive the total projected AOL Europe liability of $25 million. (*Id.* ¶ 446.)

The SEC claims that Wovsaniker and Rindner were aware of the details of the WorldCom II transaction, and that Rindner was the sole interface between Wovsaniker and the Business Affairs group—which handled the negotiations with WorldCom. (*Id.* ¶¶ 426–27.) The SEC also states that Rindner negotiated directly with WorldCom executives and

that others in the Business Affairs group went to Rindner with accounting-related questions. (*Id.* ¶¶ 449–50, 452.) The SEC argues that Rindner negotiated with WorldCom with full knowledge that the proposed advertising agreement was a "quid pro quo" for the AOL Europe liability that WorldCom had previously been willing to waive. (*Id.* ¶¶ 457, 485.) In fact, the SEC points to evidence that Rindner knew that WorldCom was willing to forgive $17 million of AOL Europe's liability (without a corresponding advertising agreement); that AOL instead wanted to pay the penalty in exchange for an advertising purchase by WorldCom; and that WorldCom would only purchase advertising if AOL paid the full amount of the liability in advance. (*Id.* ¶¶ 458, 461, 469, 473, 476, 484.) The SEC claims that Rindner participated in discussions that led to Wovsaniker's approval of revenue recognition for the December 2001 transaction. (*Id.* ¶¶ 465.)

On December 7, 2001, AOLTW and WorldCom entered into an amendment to their June 2001 Promotional Agreement. (Kelly's 56.1 ¶ 151.) The amendment added an incremental purchase obligation by WorldCom of $17 million in advertising in the fourth quarter of 2001 and the first quarter of 2002. (*Id.*) WorldCom and AOLTW also executed an agreement that added a third year to the AOLTW Voice/Data Agreement. (SEC's 56.1 ¶ 498.) In January 2002, AOL paid the $17 million AOL Europe penalty to WorldCom. (*Id.* ¶ 504.)

The SEC argues that Wovsaniker approved AOL's recognition of revenue despite knowing that WorldCom's advertising purchase was contingent on AOL's payment of the AOL Europe liability and that WorldCom had been willing to waive that liability. (*Id.* ¶ 481.) A member of AOL's Revenue Accounting group, Lori Locke, spoke to Wovsaniker about AOL having to "net" the two sides of the World-Com transaction. According to the SEC, Wovsaniker did not want to net the two sides of the deal, but he did not disclose to E & Y WorldCom's willingness to waive the $17 million accrued liability. (*Id.* ¶¶ 493–94.) After Locke spoke with Wovsaniker, Locke reported the transaction to AOLTW's finance department and (inaccurately) characterized the Network Services Agreement and the advertising agreement as separate, stand-alone deals. (*Id.* ¶ 495.)

AOL recognized $17 million in revenue from WorldCom's incremental advertising purchase in December 2001, and E & Y approved it. (Kelly's 56.1 ¶ 158.) In October 2002, the CFO Review team concluded that AOL's original accounting for the December 2001 transaction should be adjusted, and E & Y concurred. (SEC's 56.1 ¶¶ 514, 516.)

### 9. *Bertelsmann I (March 2001)*

In 1995, AOL and Bertelsmann formed a joint venture to create AOL Europe. (SEC's 56.1 ¶ 522.) In March 2000, AOL and Bertelsmann signed a Put/Call Agreement to separate their interests in AOL Europe because of antitrust concerns raised by the merger of AOL and Time Warner. (Kelly's 56.1 ¶ 163.) Under the Put/Call Agreement, Bertelsmann could exercise an option to sell its AOL Europe shares to AOL in two tranches, one in January 2002 for $5.3 billion and one in July 2002 for $1.45 billion (for a total of $6.75 billion). (Kelly's 56.1 ¶ 164; SEC's 56.1 ¶ 526.) AOL had the option to pay Bertelsmann in cash, stock, or some combination of the two. (Kelly's 56.1 ¶ 164; SEC's 56.1 ¶ 527.) If Bertelsmann did not exercise its "put," AOL could "call" Bertelsmann's shares in AOL Europe by exercising an option to buy the shares for $8.25

billion. (SEC's 56.1 ¶ 526.) Contemporaneously with the March 2000 Put/Call Agreement, AOL and Bertelsmann entered into an advertising agreement (the "Premium Ad Deal") that guaranteed Bertelsmann the ability to place $150 million of advertisements on AOL properties. (Kelly's 56.1 ¶ 165; SEC's 56.1 ¶ 546.)

Because AOL had an option to pay for its purchase of AOL Europe in a mixture of AOL stock and cash, Bertelsmann was uncertain as to the value it could receive under the Put/Call Agreement. (SEC's 56.1 ¶ 532.) If, for instance, AOL decided to settle in cash, the value of the consideration that Bertelsmann would receive would be either $6.25 billion or $8.25 billion, regardless of what happened to AOL's stock price in the surrounding period. (*Id.* ¶ 533.) However, fluctuations in AOL's stock price could affect the value received by Bertelsmann if AOL elected to settle by paying Bertelsmann with AOL stock. (*Id.*)

In early 2001, Bertelsmann attempted to monetize its put option, but Bertelsmann was unsuccessful because potential transferees of the put option could not evaluate its value due to AOL's option to pay in cash or stock. (Kelly's 56.1 ¶ 166.) As a result, in January 2001. Dr. Siegfried Luther, the CFO of Bertelsmann, met with Kelly and another AOLTW executive to ask AOLTW to amend the terms of the Put/Call Agreement to guarantee that AOLTW would settle a certain amount of the put option in cash. (*Id.* ¶ 166.)

On February 28, 2001, Kelly proposed to Dr. Luther that AOLTW would agree to change the mechanics of the Put/Call Agreement (but not necessarily commit to settling in cash) if at the same time Bertelsmann would commit to spend an additional $250 million in advertising. (*Id.* ¶ 174; SEC's 56.1 ¶¶ 553–54.) Bertelsmann rejected this proposal. (SEC's 56.1 1 555.)

On March 26, 2001, Kelly emailed Luther with a revised proposal: AOLTW offered to pay $2.25 billion of the first put price in cash (as opposed to stock) and Bertelsmann would buy an additional $125 million of advertising. (Kelly's 56.1 ¶ 179; SEC's 56.1 ¶ 558.) On the morning of March 27, 2001, Dr. Luther and Kelly agreed to the essential terms proposed by Kelly in his March 26 email: AOLTW would commit to pay $2.25 billion of the put price in cash and Bertelsmann would purchase $125 million in advertising from AOLTW by March 31, 2001. (*Id.* ¶ 180.) Later that same day, Bertelsmann's CEO, Dr. Middelhoff sent a short email to Kelly with the following proposal: "I think you could get 5% on 3 bill[ion]. We wire it before 3/31. As far as the Marketing agreement is concerned our response will be reasonable." (SEC's 56.1 ¶ 560.) The SEC argues—backed by the testimony of Dr. Middelhoff—that Dr. Middelhoff's email is an offer by Bertelsmann to pay cash ($150 million) in exchange for AOLTW's agreement to pay $3 billion of the put price in cash. (*Id.* ¶ 561.) By contrast, Kelly testified that he interpreted Dr. Middelhoff's email as an attempt to persuade AOLTW to commit to pay $3 billion of the put price in cash instead of the $2.25 billion that was agreed to on March 27, with a $150 million advertising purchase commitment from Bertelsmann. (Kelly's 56.1 ¶ 184.) The parties dispute whether Dr. Middelhoff's email was a cash offer by Bertelsmann to compensate AOL for the amendment to the Put/Call Agreement. (*See, e.g., id.* ¶ 192.) Kelly responded to Dr. Middelhoff's email on March 28, explaining that AOLTW could not commit to pay more than $2.5 billion in cash. (*Id.* ¶ 182.)

After receiving Dr. Middelhoff's email, on March 28, Kelly emailed Dr. Luther and explained that AOLTW was willing to

commit to pay $2.5 billion in cash (a $250 million increase in AOLTW's cash commitment from a day earlier). (*Id.* ¶ 183.) Apart from raising AOLTW's cash commitment, the SEC concedes that Kelly's email did not change any terms of the agreement he had reached with Dr. Luther on March 27. (*Id.*)

On March 30, 2001, AOL and Bertelsmann amended the Put/Call Agreement. (SEC's 56.1 ¶ 563). AOL agreed to pay Bertelsmann at least $2.5 billion in cash if Bertelsmann exercised its initial $5.3 billion put right. (*Id.*) The amendment to the agreement stated that AOL and Bertelsmann were concurrently entering into an amendment of the current online advertising agreement. (*Id.* ¶ 189.) The amendment to the online advertising agreement occurred on March 31, 2001. (*Id.* ¶ 190.) In that amendment, Bertelsmann agreed to increase its advertising commitment to AOL by $125 million. (*Id.*)

10. *Bertelsmann II (December 2001)*

In October 2001, negotiations resumed between AOLTW and Bertelsmann. (SEC's 56.1 ¶ 570; Kelly's 56.1 ¶ 194.) AOLTW executives proposed a second amendment to the Put/Call Agreement under which AOLTW would commit to pay cash for the remaining $4.25 billion put right. (SEC's 56.1 ¶ 573.) Kelly emailed Dr. Luther proposing that AOLTW pay the entire first step of the put in cash in exchange for a $250 million advertising commitment from Bertelsmann. (*Id.* ¶ 574.)

Dr. Luther responded to Kelly's email proposal with an offer to pay $156.5 million in exchange for AOLTW paying the remaining $4.25 billion put right in cash. (*Id.* ¶ 575.) The parties dispute whether Dr. Luther's email was a "cash offer" or an offer to purchase $156.5 million in additional advertising. (*See, e.g.,* Kelly's 56.1 ¶ 198; SEC's 56.1 ¶ 575.)

In December 2001, AOL and Bertelsmann entered into two separate agreements. (SEC's 56.1 ¶ 577.) The Put/Call Agreement was amended to require 100% cash settlement by AOLTW of the remaining portion of the put. (*Id.*) In exchange, Bertelsmann agreed to purchase $275 million in online advertising. (*Id.*) AOLTW's internal accountants reviewed and approved the accounting for the December 2001 amendments to the Put/Call Agreement. (Kelly's 56.1 ¶ 200.) AOLTW also consulted with E & Y and received E & Y's approval on the accounting. (*Id.*)

In 2002, the CFO Review team and E & Y concluded that AOLTW had properly accounted for the revenue from both Bertelsmann transactions (the March 2001 and December 2001 amendments to the Put/Call Agreement). (Kelly's 56.1 ¶ 213, 223.) However, in March 2005, as part of the company's settlement with the SEC, AOLTW restated the revenue from the Bertelsmann amendments. (*Id.* ¶¶ 227–28.)

**DISCUSSION**

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also O'Hara v. Weeks Marine, Inc.,* 294 F.3d 55, 61 (2d Cir.2002); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in its favor. *L.B. Foster Co. v. Am. Piles, Inc.,* 138 F.3d 81,

87 (2d Cir.1998) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Whether a disputed issue of fact exists is for the court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e).

Not every disputed factual issue is material. A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989)). Therefore, although a court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*

*Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party.

## I. The SEC's First and Second Causes Of Action: Securities Fraud Liability.

The SEC's first cause of action against Rindner, Wovsaniker, and Kelly is under Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and its second cause of action is under Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. (Compl. ¶¶ 195–200.)

Section 10(b) of the 1934 Act provides that no person or entity may, in connection with the purchase or sale of a security, "use or employ ... any manipulative or deceptive device or contrivance" in contravention of an SEC rule. 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful, in connection with the purchase or sale of a security, "(a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or ... omit ... a material fact necessary in order to make the statements made ... not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5.

To establish liability under Section 10(b), the SEC must show that "in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996) (citing cases). A misrepresentation or omission is material if there is a substantial likelihood that

the misrepresentation "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Further, unlike a private plaintiff, the SEC need not allege or prove reliance, causation, or damages in an action under Section 10(b) or Rule 10b–5. *SEC v. Credit Bancorp, Ltd.,* 195 F.Supp.2d 475, 490–91 (S.D.N.Y.2002).

The elements of a claim under Section 17(a)(1) are "essentially the same" as the elements of a claim under Section 10(b) and Rule 10b–5. *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir.1999). Section 17(a) of the 1933 Act makes it unlawful "(1) to employ any device, scheme, or artifice to defraud. (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates . . . as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a). While a plaintiff must prove scienter under 17(a)(1), no such showing is required under Sections 17(a)(2) or (3). *Monarch Funding,* 192 F.3d at 308 (citation omitted).

■ "Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *First Jersey,* 101 F.3d at 1467 (internal citations omitted). "The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences. Whether a given intent existed is generally a question of fact,

appropriate for resolution by the trier of fact." *Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999) (internal citations and quotations omitted).

■ Whether one is a primary violator of Section 10(b), Section 17(a), and Rule 10b–5 or an aider and abettor "turns on the nature of [one's] acts, not on [one's] state of mind when [one] performs them." *SEC v. U.S. Envtl., Inc.,* 155 F.3d 107, 111 (2d Cir.1998). In *Scholastic,* for instance, the Second Circuit held that an executive could be primarily liable for misstatements not specifically attributed to him, where he "was primarily responsible for [the company's] communications with investors and industry analysts," and "was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by [the company] during the class period." *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 75–76 (2d Cir. 2001). In an SEC enforcement action, an individual can be held primarily liable for misstatements under Sections 10(b) and 17(a) if the individual "was sufficiently responsible for the statement—in effect, caused the statement to be made—and knew or had reason to know that the statement would be disseminated to investors." *SEC v. KPMG LLP,* 412 F.Supp.2d 349, 375 (S.D.N.Y.2006).

All three Defendants seek summary judgment on the SEC's Section 10(b), Section 17(a), and Rule 10b–5 claims in the first and second causes of action. Because genuine issues of fact exist regarding each defendant's state of mind, the motions are denied.

### 1. *Rindner*

■ The SEC's first and second causes of action against Rindner cannot be summarily dismissed because material issues of fact exist as to whether Rindner was acting with scienter. Rindner claims that

he has no accounting background, does not understand complex accounting rules, and therefore could not have known that AOL was recognizing revenue improperly. (Rindner 56.1 ¶¶ 33–35.) But the SEC has adduced evidence that Rindner knew that so-called "round trip" transactions were improper (SEC's 56.1 ¶ 63–65, 70–71) and that AOLTW was engaging in such transactions. (SEC's 56.1 ¶¶ 458–59, 461.)

For example, during negotiations with Telefonica in 2000, Rindner was asked about whether an AOL affiliate paying a higher price for network services from Telefonica could also recognize the advertising revenue generated by the Telefonica transaction. (SEC's 56.1 ¶ 202.) In response. Rindner explained that an AOL affiliate should not recognize the revenue (despite paying the higher prices) because the advertising revenue could be viewed as a built in discount which would require AOL to net the revenue against the expense of the network services. (SEC's 56.1 ¶ 203) Moreover, the SEC argues that Rindner understood the contingent nature of the advertising and network services commitment with Telefonica (*id.* ¶ 208) and advised others within the Business Affairs group to avoid "cross-referencing" the two agreements in documents so as to prevent accountants from asking questions about AOL's recognition of the advertising revenue (*id.* ¶¶ 210–212.)

The SEC also has evidence that Rindner participated in the negotiations with WorldCom and knew that AOL was willing to forgo a discount for WorldCom's agreement to purchase more advertising. (SEC's 382, 457, 485, 458, 461, 469, 473, 476, 484.)

Thus, disputes about material facts preclude the grant of summary judgment for Rindner.

### 2. *Wovsaniker*

 Wovsaniker argues that he is entitled to summary judgment because the SEC has no evidence that he acted with scienter—meaning, that he knew of AOL's fraudulent recognition of advertising revenue. (Wovsaniker Br. 20–23.) The SEC, however, has sufficient evidence to raise a genuine issue of fact as to whether Wovsaniker knew that AOL's financial statements were inaccurate.

The SEC points to evidence from several of the round-trip transactions that demonstrate that Wovsaniker knew that AOL was improperly recognizing revenue. For instance, with regards to the Sun transaction in 2000, the SEC claims that Wovsaniker knew that Sun offered to compensate AOL for large equipment purchases with a higher discount than AOL was receiving under its then-current agreement with Sun, but that AOL turned down the larger discount for an advertising commitment from Sun. (SEC's 56.1 ¶ 77,78,85,86,87,88, 110–11.) According to the SEC, Wovsaniker approved AOL's recognition of $37.5 million as advertising revenue from Sun despite knowing that AOL was foregoing a higher discount in order to extract an advertising purchase from Sun. (SEC's 56.1 ¶ 102, 99.) Another example the SEC points to is the Wembley settlement. The SEC claims that Wovsaniker approved AOL's recognition of $23.8 million in revenue based on Wembley's advertising commitment despite knowing that Wembley offered to settle the legal dispute with a cash payment of $20 million. (SEC's 56.1 ¶ 304–306, 323.)

There are also disputed issues of fact concerning Wovsaniker's role in the fraudulent round-trip transactions. Wovsaniker claims that he was not responsible for approving AOL's accounting for transactions with other counterparties. (Wovsaniker's 56.1 ¶ 50, 52, 43–44.) By contrast,

the SEC contends that Wovsaniker was responsible for AOLTW properly accounting for its advertising revenue and approved AOL's accounting treatment for the ten round-trip transactions at issue here. (*See* SEC Reply to Wovsaniker's 56.1 ¶¶ 44, 49, 52, 53, 54; *see also* SEC's 56.1 ¶ 102, 99, 130–33, 173, 216, 263, 323, 387, 390, 481). Additionally, the SEC argues that Wovsaniker communicated with AOLTW's outside auditors, providing E & Y with the information it needed to determine whether AOL was properly recognizing revenue. (SEC's reply to Wovsaniker 56.1 ¶ 63, SEC's 56.1 ¶ 326, 395.) Thus, summary judgment is improper because issues of fact exist as to whether Wovsaniker acted with scienter.

### 3. *Kelly*

■ Kelly is also not entitled to summary judgment dismissing the SEC's first and second causes of action because there are genuine issues of fact about whether Kelly was aware of information that should have alerted him to AOL's improper recognition of revenue on the round-trip transactions. As a certified public accountant, the SEC claims that Kelly would have understood that it was improper for AOL to recognize revenue on the transactions in the complaint. (SEC's 56.3 ¶ 592.) Moreover, as AOLTW's CFO, Kelly signed AOLTW's 10–Q, 10–K, and management representation letters to E & Y representing that the Company's financial statements were prepared in conformity with GAAP. (SEC's 56.1 ¶¶ 24–30.)

Although Kelly denies knowing about the alleged discounts that AOL turned down (Kelly's 56.1 ¶ 75–76), the SEC contends that, in at least some of the round-trip transactions Kelly knew that AOL gave up discounts for an advertising commitment. For instance, the SEC argues that Kelly knew that AOL turned down a

discount offered by Sun in exchange for Sun's advertising purchase. (SEC's 56.1 ¶ 77.) The SEC also offers evidence that Kelly knew that Bertelsmann had made a cash offer to compensate AOLTW for amending the Put/Call Agreement and that Kelly turned down the cash offer in order to receive an advertising commitment from Bertelsmann. (SEC's 56.1 ¶¶ 560–61.) Of course, Kelly disputes that the offer by Bertelsmann's CEO was an offer to pay cash, (Kelly's 56.1 ¶ 184), but that raises an issue of fact.

Accordingly, summary judgment is also denied on the first and second claims because genuine issues of fact exist as to whether Kelly was acting with scienter.

## II. The SEC's Third And Seventh Causes Of Action: Aiding And Abetting Liability

■ The SEC's complaint alleges aiding and abetting violations of Section 10(b) of the 1933 Act, Sections 13(a) and 13(b)(2)(A) of the 1934 Act, as well as aiding and abetting violations of Rules 10b–5, 12b–20, 13a-1 13a–11, 13a–13 and 13b2–1 (the SEC's third and seventh causes of action).

■ Section 20(e) of the 1934 Act provides that any person who "knowingly provides substantial assistance" to another in connection with a violation of the 1934 Act is "deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e) (2009). To state an aiding and abetting claim under Section 20(e), the SEC must allege facts showing that: (1) there was a primary violation of the securities laws, (2) the defendant had knowledge of the primary violation, and (3) the defendant provided substantial assistance in the primary violation. *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir.2009).

A claim for aiding and abetting requires proof that Defendants had actual knowledge of the alleged violations. *SEC v. Cedric Kushner,* 417 F.Supp.2d 326, 334 (S.D.N.Y.2006); *SEC v. Stanard,* 2009 WL 196023, at \*32 (S.D.N.Y. Jan. 27, 2009); *SEC v. Espuelas,* 579 F.Supp.2d 461, 471 (S.D.N.Y.2008). To show "substantial assistance," the aider and abettor's conduct should be a "substantial causal factor in the perpetuation of the underlying violation." *See SEC v. Espuelas,* 579 F.Supp.2d 461, 471 (S.D.N.Y.2008) (citing *SEC v. Zwick,* No. 03 Civ. 2742, 2007 WL 831812, \*16 (S.D.N.Y. Mar. 16, 2007)).

Defendants all deny having actual knowledge that AOL was fraudulently recognizing revenue in violation of the securities law. However, as discussed above, the SEC has adduced sufficient evidence to raise a genuine issue of fact on that score. Thus, Defendants' motion for summary judgment dismissing the SEC's third and seventh causes of action are also denied.

### III. The SEC's Fourth and Fifth Causes Of Action: Record–Keeping Violations.

The SEC's complaint alleges that Rindner, Wovsaniker, and Kelly violated Rule 13b2–1, promulgated under Section 13(b)(2)(A) of the Exchange Act (fourth cause of action) and that Kelly and Wovsaniker violated Exchange Act Section 13(b)(5) (fifth cause of action).

Section 13(b)(2)(A) of the 1934 Act requires public companies to maintain "books, records, and accounts" that "accurately and fairly reflect ... transactions and dispositions of [ ] assets. 15 U.S.C. § 78m(b)(2). Section 13(b)(5) of the 1934 Act provides that "no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, rec-

ord, or account" required to be maintained pursuant to Section 13(b)(2). 15 U.S.C. § 78m(b)(5). Rule 13b2–1 provides that "no person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account" maintained pursuant to Section 13(b)(2)(A). 17 C.F.R. § 240.13b2–1.

### A. Violations of Rule 13b2–1 (Fourth Cause of Action)

The SEC need not prove scienter to succeed on a claim for a primary violation of Rule 13b2–1. *Espuelas,* 579 F.Supp.2d at 486; *see also SEC v. McNulty,* 137 F.3d 732, 740–1 (2d Cir. 1998). Instead, liability under Rule 13b2–1 is predicated on reasonableness. *Id.* The reasonableness of each defendant's conduct depends, in part, on whether each defendant knew that AOL was trading discounts for advertising purchases and also knew that recognizing revenue on such transactions was improper. For the reasons set forth above, there are genuine issues of material fact regarding Defendants knowledge that AOL was trading discounts and cash payments for advertising commitments from counterparties. Thus, the motions of all three Defendants are denied.

### 1. Rindner

There are genuine issues of fact regarding Rindner's involvement in directly or indirectly contributing to the falsification of AOLTW's financial statements. Rindner denies "materially contribut[ing]" to the creation of false financial statements by AOL (Rindner's Br. 23) but the SEC argues that Rindner created deal summaries and contracts that hid the true substance of the round-trip transactions to prevent accountants from questioning AOL's decision to recognize the revenue. (SEC's 56.1 ¶¶ 209–11, 211–12, 214–15.

142–43). For instance, the SEC has evidence that Rindner instructed another Business Affairs executive, in preparing deal documents for the Telefonica transaction, to obscure the link between the advertising deal and the network services agreement so that accountants would not question AOL's recognition of the advertising revenue. (SEC's 56.1 ¶¶ 210–12.)

### 2. Wovsaniker

There are also genuine issues of material fact regarding Wovsaniker's involvement in directly or indirectly contributing to the falsification of AOLTW's financial statements. The SEC argues that Wovsaniker was ultimately responsible for approving the accounting treatment of the round-trip transactions at AOL (SEC's 56.1 ¶ 43, 39, 40, 38) and, as discussed, whether Wovsaniker knew that AOL had forgone discounts on those transactions is a disputed question of fact.

### 3. Kelly

Kelly argues that he is entitled to summary judgment dismissing the SEC's fourth cause of action because the SEC has no evidence that Kelly unreasonably contributed to or caused the falsification of any books and records. (*See* Kelly's Br. 31.) In its opposition brief, the SEC does not respond to Kelly's argument that he is entitled to summary judgment on this claim, and Kelly argues that the SEC has abandoned its fourth claim because it failed to respond to his arguments for summary judgment.

Kelly is correct. *See Marache v. Akzo Nobel Coatings, Inc.,* 2010 WL 3731124, at *2 (S.D.N.Y. Sept. 7, 2010) (granting summary judgment because plaintiff abandoned claim by "failing to respond or even mention [the] claim" in his opposition brief to defendant's motion); *Nat'l Commc'ns Ass'n v. Am. Tel. & Tel. Co.,* 1998 WL

118174, at *28 (S.D.N.Y. Mar. 16, 1998); *see also Lipton v. Cnty. of Orange,* 315 F.Supp.2d 434, 446 (S.D.N.Y.2004) (citing cases).

Accordingly, Kelly's motion for summary judgment dismissing the fourth claim cause of action is granted.

### B. Violations of Exchange Act Section 13(b)(5) (Fifth Cause of Action)

The SEC's fifth cause of action is asserted against Kelly and Wovsaniker, but not Rindner, To establish a claim under Section 13(b)(5), there must be a showing that the Defendants acted with knowledge. *SEC v. Stanard,* 2009 WL 196023, at *30 (S.D.N.Y. Jan. 27, 2009).

### 1. Kelly

For the reasons discussed, the SEC's fifth cause of action against Kelly is abandoned because the SEC did not address Kelly's arguments for summary judgment on this claim.

### 2. Wovsaniker

■ As discussed, questions of fact exist regarding Wovsaniker's knowledge that AOL was recognizing revenue on transactions when it had rejected a discount or a cash payment for that revenue. Thus, Wovsaniker's motion for summary judgment dismissing the SEC's fifth cause of action is denied.

## IV. The SEC's Sixth Cause Of Action: Misrepresentations to Auditors .

■ Rule 13b2–2 provides, *inter alia,* that "no officer or director of an issuer, or any other person acting under the direction thereof, shall directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence any … accountant engaged in the performance of an

audit or review of the financial statements ... if that person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading." 17 C.F.R. § 240.13b2–2. "Under Rule 13b2–2, liability attaches when ... someone acting under the direction of an officer or director contribute[s] to the issuance of materially misleading financial statements." *SEC v. 800america.com, Inc.*, 2006 WL 3422670, at *10 (S.D.N.Y. Nov. 28, 2006). "Like Rule 13b2–1, 13b2–2 does not require the SEC to plead scienter." *SEC v. Espuelas*, 698 F.Supp.2d 415, 436 (S.D.N.Y.2010) (citing *SEC v. McNulty*, 137 F.3d 732, 740–41 (2d Cir.1998)). Liability under Rule 13b2–2 is predicated on reasonableness. *Id.*

The SEC asserts its sixth cause of action against Wovsaniker and Kelly only.

### 1. *Kelly*

The SEC has abandoned this claim as well by failing to respond to Kelly's dispositive arguments. Therefore, summary judgment is granted in Kelly's favor dismissing the SEC's sixth cause of action.

### 2. *Wovsaniker*

■■■ Genuine issues of fact exist as to whether Wovsaniker acted reasonably in withholding certain information from E & Y. Wovsaniker argues that members of the E & Y audit team were aware that AOL often entered into separate transactions with counterparties that were executed simultaneously and that E & Y treated such transactions as concurrent transactions. (Wovsaniker's 56.1 ¶ 75). The SEC counters that Wovsaniker never told E & Y that AOL gave up discounts or cash payments on those transactions to induce the counterparty to purchase advertising from AOL. (SEC's 56.1 ¶ 96, 77, 78.) Specifically, on the round-trip transaction with Veritas, the SEC argues that Wovsaniker knew that AOL had paid an additional $20 million for the software license so that Veritas purchase $20 million in advertising and that Wovsaniker did not convey this information to E & Y during its audit of AOLTW's financial statement. (SEC 56.1 ¶ 145, 146, 132, 133) The SEC also argues that Wovsaniker withheld from E & Y documents created by AOL's Business Affairs group that would have revealed to E & Y that AOL had originally negotiated to pay only $30 million for the software license instead of the $50 million it paid in order to fund Veritas's advertising purchase. (SEC's 56.1 ¶¶ 148–151.) Additionally, the SEC has evidence that when E & Y requested confirmation that the Veritas advertising agreement was not contingent upon a purchase of software by AOL, Wovsaniker directed the Business Affairs group to confirm that the advertising agreement was not contingent, despite knowing otherwise. (SEC's 56.1 ¶¶ 150–52.) Thus, genuine issues of fact exist regarding the reasonableness of Wovsaniker's conduct that preclude granting his motion for summary judgment.

## V. Disgorgement

In its prayer for relief, the SEC seeks disgorgement of ill-gotten gains from the Defendants. (Compl. (v).) Kelly and Rindner argue that they are entitled to summary judgment on the SEC's disgorgement request because the SEC adduces no evidence about the amount of Rindner's or Kelly's compensation that resulted from the alleged wrongdoing. (Rindner's Br. 24; Kelly's Br. 34–35.)

■■■■■ In the exercise of its broad equitable powers, a district court may order the disgorgement of profits obtained through the violation of federal securities laws. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir.1972). The disgorgement remedy "consists of factfind-

ing by a district court to determine the amount of money acquired through wrongdoing—a process sometimes called 'accounting'—and an order compelling the wrongdoer to pay that amount plus interest to the court." *SEC v. Cavanagh,* 445 F.3d 105, 116 (2d Cir.2006). The disgorgement amount need only be a "reasonable approximation of profits causally connected to the violation," and "any 'risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *SEC v. Patel,* 61 F.3d 137, 139–40 (2d Cir.1995) (quoting *SEC v. First City Fin. Corp., Ltd.,* 890 F.2d 1215, 1231–32 (D.C.Cir. 1989) (alteration in original)). However, because the disgorgement remedy is remedial, rather than punitive, a court cannot order disgorgement of an amount above that which was wrongfully acquired. *Cavanagh,* 445 F.3d at 116 n. 25.

In *SEC v. Jones,* 476 F.Supp.2d 374 (S.D.N.Y.2007), for instance, the SEC sought disgorgement of the money obtained by Defendants that resulted from their alleged misrepresentations and omissions. *Id.* at 386. In dismissing the SEC's request for disgorgement, the court explained that the SEC had no evidence of "specific profits subject to disgorgement." *Id.* The only evidence offered by the SEC was statements by one of the defendant's supervisors that the defendant's compensation was based on how he performed on significant projects, that the project at issue was a large project, and that the defendant's compensation for one year might have been affected by that project. *Id.* (citations omitted). In concluding that dismissal of the disgorgement request was proper the court stated, "[T]he Commission is unable to provide the Court with any guideposts for determining the proper amount of Defendants' compensation subject to disgorgement. Although the Court need only determine a reasonable approximation of Defendants' compensation causally connected to the alleged violations before ordering disgorgement, the Commission has provided no evidence which would allow the Court to do so." *Id.*

█ Similarly, in its papers opposing Rindner's and Kelly's motions for summary judgment, the SEC has proffered no evidence this Court could use to reasonably approximate the percentage of Rindner's and Kelly's compensation that was causally connected to the alleged violations.

In response to a discovery request from Rindner to identify the nature and amount of his alleged profit from selling AOL stock at prices inflated by the alleged fraud, the SEC did not identify a single stock sale; instead it cited his yearly compensation and bonus amounts. (Rindner's 56.1 ¶ 18.) But there is no evidence that Rindner's entire compensation from 2000 through 2003 was tied to AOL's recognition of advertising revenue on the round-trip transactions, and there is no evidence in the record that would allow this Court to determine what percentage of his compensation should be disgorged. There is no evidence showing that Rindner's bonus or salary was pegged to individual transactions, and there is no evidence of the degree to which the ten round-trip transactions impacted his annual compensation.

The same is true for Kelly. The SEC has adduced no evidence linking the financial performance of AOLTW's stock to the round-trip transactions and there is no evidence linking Kelly's compensation and bonuses to the company's financial performance. The Court has no way to determine the portion of Kelly's compensation that is causally connected to the alleged wrongdoing and therefore cannot reasonably approximate the ill-gotten gains the

SEC seeks to disgorge. Additionally, because the SEC did not address Kelly's argument for dismissal of the disgorgement remedy in its opposition brief, the SEC has abandoned its claim for disgorgement against Kelly.

## VI. The SEC's Claim For Civil Penalties Is Timely.

Finally, Kelly argues that the SEC's claim for civil penalties is barred by the five-year statute of limitations in 28 U.S.C. § 2462. (Kelly's Br. 32–33.) In an earlier opinion disposing of Defendants' motion to dismiss, the Court concluded that the SEC's claim for civil penalties was timely under the continuing violation doctrine. *SEC v. Kelly*, 663 F.Supp.2d 276, 287–88 (S.D.N.Y.2009). The Court explained that "as alleged in the complaint, the effects of the scheme lasted through 2003, with the last affirmative misstatement being the filing of a false and misleading form 10–Q in connection with the Bertelsmann deal on November 14, 2002." *Id.* at 288. Thus, the SEC's claim for civil penalties could be predicated on conduct that occurred before May 11, 2002 (the relevant accrual cut-off date for civil penalties against Kelly), because the conduct that occurred outside the statute of limitations period is so closely related to the conduct that is not time barred as to be viewed as part of a continuing violation. *Id.*

■ Kelly now argues that the SEC has no evidence that the December 2001 Bertelsmann transaction—the last round-trip transaction for which a false or misleading 10–Q was filed with the SEC during the limitations period—was part of a scheme at AOL to improperly inflate advertising revenue and, moreover, even if a scheme did exist, there is no genuine issue of fact as to Kelly's participation in the purported scheme. (Kelly's Br. 33–34.) As discussed, there is a genuine issue of

fact as to whether Kelly knew that AOL was trading discounts for advertising commitments and therefore was unable to recognize the revenue on the round-trip transactions. For instance, the parties dispute whether Kelly knew that Bertelsmann's CEO offered AOL a cash payment of $150 million in exchange for AOL agreeing to modify the terms of the Put/Call agreement. (SEC's 56.1 ¶¶ 560–61.) Additionally, the SEC has adduced sufficient evidence to raise a genuine issue of fact as to the existence of a scheme at AOL to convert discounts from counterparties into advertising revenue—of which the 2001 Bertelsmann transaction was a part. (*See, e.g.*, SEC's 56.1 ¶¶ 162–63, 165, 218, 241–42, 270, 319, 375, 420–21.) Thus, the SEC's request for civil penalties cannot be dismissed at this stage.

## CONCLUSION

For the reasons discussed, Wovsaniker's and Rindner's motions for summary judgment are denied in their entirety. Kelly's motion for summary judgment dismissing the SEC's fourth, fifth, and sixth causes of action is granted. Kelly's motion for summary judgment dismissing the SEC's first, second, and third causes of action is denied. Kelly's motion to dismiss the SEC's civil penalties is denied. The SEC's request for disgorgement from Kelly and Rindner is dismissed.